DILLINGHAM et al. v. EBY.

No. 31944. Dec. 18, 1945.

164 P. 2d 646.

Simons, Simons, Mitchell & Headrick, of Enid, for plaintiff in error.

Dave Bucher and Page Belcher, both of Enid, for defendant in error.

BAYLESS, J. John F. Eby filed an action in the district court of Garfield county against the trustees of Memorial Park Cemetery, a trust, and against the Trust, to recover damages for the breach of contract. He recovered judgment from which the defendants appeal, but being dissatisfied with the measure of damages allowed in his recovery, cross-appeals.

The Trust was organized to own and operate a cemetery, and its declaration of trust was duly recorded. Huggins was its general manager and one Shands, under an agreement with Huggins to sell cemetery lots for the Trust, approached Eby with the proposition to sell him 23 lots in the cemetery for $50 each, taking as payment therefor 52 shares of stock in a building and loan association of a par value of $5,200, but then of less value due to the general depression. The agreement between Huggins and Shands was that the Trust would issue deeds to cemetery lots to whomever Shands named upon the payment by Shands to the Trust of $50 per lot. Shands induced Eby to trade this depreciated stock for these lots at the price above named upon the representation that the lots could be sold to the public for $250 each and that the Trust would give Eby a guarantee to so sell the lots which he would purchase within three years. Eby became interested and accompanied Shands to the office of the Trust in Enid, and there met Huggins. He questioned the power to give him such a guarantee and requested permission to examine the declaration of trust. After making an examination of this declaration, Eby decided to make the trade and it was consummated within the next few days.

He was given a deed to 23 numbered lots in the cemetery. This deed, along with other unexecuted deeds, was in Huggins' possession with the signatures of the president and secretary of the Trust thereon. The deed given Eby was completed in his presence by being filled in at such places as needed to complete it, including the acknowledgment by the notary and probably the affixing of the seal of the Trust. In addition to the deed, the Trust issued to Eby a certificate, as provided by the fifteenth section of the Trust agreement, representing his right as a beneficiary under the Trust agreement by virtue of his ownership of lots in the cemetery. Such a certificate is issued to all lot owners. A supply of these certificates was in Huggins' possession, signed by the president and secretary but otherwise incomplete, and the certificate was completed and delivered to Eby in about the same manner as the deed. In addition to the deed and certificate, Huggins wrote Eby a letter, on the stationery of Memorial Park Trust, as follows:

"This will advise in connection with your purchase from William Shands of lots (describing them) that Memorial Park will list these lots for sale and show them to prospective purchasers and endeavor to sell them for you at whatever price you designate. We will also extend you the privilege of exchanging the above described lots for any lot or lots in lieu thereof as the same is or shall be platted into lots, exclusive of Section A, known as the Masonic Section, without any additional cost.

"Further, I will guarantee to sell said lots within three years time at $250.00 per lot unless otherwise instructed.

"A charge of ten per cent (10%) to cover cost of selling will be made on all sales consummated through this office.

"Very truly yours, Memorial Park Cemetery (signed) J. G. Higgins, J. G. Huggins, Mrg."

Eby testified that he had never seen Shands since the completion of this deal, that no sales of the lots were made. Whereupon he began to press the matter and discussed the deal with some of the trustees separately at various times, none of whom repudiated the contract evidenced by the letter, and that more than three years had passed without any sales being made. The only trustee who testified declared he had denied Huggins' power to execute the letter when it was called to his attention. See 3 C. J. S. 160, § 237(c), for the effect of this.

The first propositions urged by the Trust are that the purported contract of guaranty relied on by Eby is unauthorized and is unilateral and therefore void as to it. A reference to the letter quoted above indicates that the first paragraph purports to express what the Trust will do, whereas the second paragraph is prefaced with the personal pronoun "I," which the Trust argues was the personal obligation of the manager and not the Trust's obligation, and particularly was this true because he lacked authority to bind the Trust for the matter specified in the second paragraph. We do not agree with this construction of the letter, and the authorities very generally hold that diversity of use of personal pronouns in contracts relating to corporate affairs is not of controlling significance. 44 Words and Phrases 773; 31 C.J. 235, and 67 C.J. 1465. The letter as a whole relates to matters which affected the Trust in its corporate capacity and did not in any wise affect the manager, Huggins, personally, and we think it would be a distortion of the general purport and intent of the letter to construe it as the Trust urged us to do. In determining whether the manager had authority to give this guaranty or transgressed the bounds of his authority in so doing, the issue is one of fact to be judged by whether the promise which he makes is the original obligation of the principal and relates to the matter in which it is directly interested or is collateral to another's promise. Oil City Iron Works v. Bradley, 171 Ark. 45, 283 S. W. 362, and Powell & Powell v. King Lumber Co.,

168 N. C. 632, 84 S. E. 1032. It is said in Channell Bros. v. W. Va. P & P Co., 77 W. Va. 494, 87 S. E. 876, where the local general manager for a pulp paper company agreed for his principal to guarantee the payment for feed delivered by a third person to a teamster hauling for the principal, that while guaranties and suretyships were not within the scope of the principal's business, yet if the promise was an original undertaking of the principal, it was neither a guaranty nor a suretyship. In this instance, the obligation which Huggins had the Trust undertake was the original undertaking of the Trust and was not collateral to any other person's promise or undertaking, and the question of whether it was within the apparent scope of his authority was a question of fact for the trier of the facts. The disposition of this aspect of the lawsuit would be more difficult if it were not for the next phase of the case to be discussed.

The general rule is that where an agent has acted for his principal in a manner which the principal charges is contrary to or in excess of the authority conferred upon him, and the principal obtains benefits therefrom, it is the duty of the principal to repudiate the entire transaction and to restore to the other person the thing of value which the principal received through the transaction. This rule is well established in Oklahoma. Lee v. Little, 81 Okla. 168, 197 P. 449, and J. I. Case v. Lyons Co., 40 Okla. 356, 138 P. 167. See 2 C. J. S. 1145, § 66. The record contains evidence that this transaction was called to the individual attention of the trustees from time to time, and while all of them eventually communicated to Eby their view that Huggins lacked authority to make this transaction, nevertheless they did not offer him back his money. The keeping of the benefits of this transaction by the Trust precludes it from denouncing the so-called unauthorized part of the transaction.

Eby has cross-appealed, raising primarily the question of the measure of damages allowed to him. He takes the position that the contract was breached in its entirety and that he should be made whole. By this he means that he should have returned to him the building and loan stock which he delivered to Shands or he should have judgment against the Trust for $225 per lot as guaranteed to him by the letter. The record conclusively shows that Shands never delivered these shares of stock to the Trust, and Trust is not able to return it.

The trial court determined that at the time of the transaction the lots were of a value of $50 each, or $1,150, and that the value of the stock which Eby surrendered to Shands was $2,080, and rendered judgment for Eby against the Trust for $930, the difference. Under the record before us as made by the parties, we are inclined to think that this does substantial justice and does not violate any recognized rule of law. For instance, as stated above, it was necessary for the Trust, if it desired to be relieved of the burden of the unauthorized portion of the transaction, to tender back to Eby the $1,150 which it received from the transaction. It did not do this. At the outset, when Eby became aware of the fact that he had a cause of action, he could have sued (1) to rescind the contract, or (2) to recover damages for the breach thereof, and he chose the latter course. Thus he chose to retain the lots. If he had rescinded, he would have been required to return the lots. Insofar as this judgment is concerned, he will retain the lots. They have not been shown to be without value. In order for him to recover for their full value it would be necessary for him to show that they were entirely without value. Actually, the record discloses that any of these cemetery lots sold to the public for burial purposes are always sold for $250. There was no showing as to their market value for speculative purposes. Under the showing made by Eby we are unwilling to say that error was committed against him in the measure of damages adopted.

The judgment appealed from is affirmed.

GIBSON, C.J., HURST, V.C.J., and OSBORN, WELCH, CORN, and DAVISON, JJ., concur.